IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACTUATE CORPORATION,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>AON CORPORATION and TWG WARRANTY GROUP,<br><br>　　　　Defendants.<br>　　　　　　　　　　　　　　　　/ | No. C 10-05750 WHA<br><br>**TENTATIVE ORDER GRANTING IN PART AND DENYING IN PART CROSS MOTIONS FOR SUMMARY JUDGMENT** |

## INTRODUCTION

In this copyright-licensing action, the parties file cross motions for summary judgment. For the reasons stated below, the motions are tentatively **GRANTED IN PART** and **DENIED IN PART**. By **NOON ON TUESDAY, JUNE 5**, the parties are invited to comment on this tentative order in three-page briefs without any attachments and limited to the existing record.

## STATEMENT

Plaintiff Actuate Corporation owns copyrighted software for business intelligence — such as iServer, eReports and Query, the products at issue in this action — and licenses its software to other businesses. Actuate also provides maintenance services to its customers (Tadlock Decl. Exhs. 2–10).

Defendant Aon Corporation provides risk management services and has approximately 62,000 employees in more than 120 countries. Defendant TWG Warranty Group, Inc.,

incorporated and headquartered in Illinois, provides underwriting, administration and marketing of service contracts and related benefits. Both Aon and TWG Warranty have used Actuate's software. The parties dispute which licenses, if any, governed defendants' use of Actuate's copyrighted software. For the most part, the parties do not dispute the events that occurred, discussed below.

**1. AON.**

Between 1998 and 2003, Aon purchased CPU-based licenses from Actuate for its software (*see, e.g.*, Wong Aon Decl. Exhs. 2, 6; Moize Decl. ¶ 5). In September 2003, Aon entered into a EUSLA (end user software license agreement) with Actuate. When the 2003 EUSLA was signed, available CPUs in the market had a single core processor. Multi-core processors were not available. Between 2003 and 2005, Aon purchased additional software licenses from Actuate and made annual maintenance payments. In total, over the course of the parties' relationship, Aon licensed ten CPUs of Actuate's iServer, eReports and Query software and on occasion upgraded to new versions of each.

In January 2006, Actuate delivered version 8 of its software to Aon. In order to receive and download version 8, Aon employees were required to "click through" new terms during the installation process. These new terms are referred to as the 2005 Clickwrap agreement and purported to limit Aon's ability to use Actuate software on multi-core processors because the new terms defined a CPU to mean a single core processor (Tadlock Decl. Exhs. 11–12).

Between 2008 and 2009, Aon used Actuate's iServer, eReports and Query software on multi-core processors (Smith Decl. Exh. 1 at 7–8, Exh. 4 at 112, Exh. 7). Aon used 10 CPUs with twenty CPU cores despite only having license to ten "CPUs" (Tadlock Decl. Exh. 15 at 7–8, 16). This would have been in violation of the 2005 Clickwrap.

There are no genuine disputes about the facts discussed above. The dispute between Actuate and Aon is whether Aon's use of the software was governed by the terms of the 2005 Clickwrap agreement (which expressly differentiated between CPU and CPU cores) or 2003 EUSLA (which did not).

2

### 2. TWG WARRANTY.

Prior to 2006, TWG Warranty was a subsidiary of Aon named Aon Warranty Group ("AWG").  AWG had a perpetual license to the Actuate software at issue (Tadlock Decl. Exh. 27; Chin Opp. Decl. Exh. 1 at 5).  In June 2006, Aon entered into a purchasing agreement to sell AWG to Onex Corporation, a Canadian company (more precisely, AWG would be sold to Onex's subsidiary, Warrior Acquisition Corporation) (Mittenthal Decl. Exh. 1).  To facilitate the sale, the parties created a number of parent and subsidiary corporations, executed a voluminous purchase agreement, and engaged in several name changes.  The material facts will be summarized below.

In June 2006, Warrior Acquisition Corporation and Aon entered into the purchase agreement for AWG, to be effected in November 2006 (*ibid.*).  Onex paid Aon approximately $800 million and obtained a 98% ownership interest in return (Chin Decl. Exh. 7 at 1, 11 and 68; Mittenthal Decl. Exh. 1 at 15–16).  Before the sale finalized, Warrior Acquisition Corporation changed its name to TWG Holdings, Inc. (Mittenthal Decl. Exh. 3).

Prior to the effect date of the sale, AWG was renamed to TWG Warranty Group, Inc. (Mittenthal Decl. Exh. 4).  The purchase agreement had required this name change because AWG would not have been affiliated with Aon after the sale (Mittenthal Decl. Exh 1 at 52–53).  Importantly, when AWG was renamed TWG Warranty, there was no sale of assets;  TWG Warranty kept all of AWG's assets, including employees, personnel, offices, infrastructure, and other assets (Jackovich Decl. ¶¶ 2, 5); *see* Mittenthal Decl. at Exh. 1).  TWG Warranty was (and is) a corporate entity with its own stock.  The Illinois Secretary of State recognized that the "Old Corp Name" of TWG Warranty was AWG and maintained a single "File Number" for TWG Warranty and AWG (Dkt. No. 49).  These facts are not disputed.[1]

---

[1] Actuate does object to the declaration of Anthony Jackovich, who was the Chief Technology Officer of both AWG and TWG Warranty, for lack of foundation and hearsay.  This objection is rejected.  As stated in his declaration, Mr. Jackovich's testimony is based on his personal knowledge as an officer of AWG, then TWG Warranty.  Mr. Jackovich's declaration also lays sufficient foundation for his testimony that no assets were transferred and operations remained the same when AWG became TWG Warranty.  Such testimony does not constitute a legal conclusion but is grounded in Mr. Jackovich's personal knowledge by virtue of having served as an officer of the company before and after the name change and stock acquisition.

TWG Warranty's request for judicial notice of the online State of Illinois Secretary of State

To sum up, Aon sold its subsidiary AWG to Onex, and in the process AWG changed its name to TWG Warranty. After Onex acquired all of its stock, TWG Warranty continued to use Actuate software without obtaining a new license. The dispute between the parties is whether AWG's name change and stock sale voided the license to Actuate software and therefore required TWG Warranty to obtain a new license.

## ANALYSIS

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c). An issue is genuine only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party, and material only if the fact may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

A copyright infringement claim can only be asserted if "a license is limited in scope and the licensee acts outside the scope." *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119–22 (9th Cir. 1999).

**1. GENUINE DISPUTE OF MATERIAL FACT REGARDING AON'S LIABILITY.**

Summary judgment is inappropriate if there is a dispute as to material facts concerning the intent of the parties to form a contract. *Experimental Engineering, Inc. v. United Technologies Corp.*, 614 F.2d 1244, 1247 (9th Cir. 1980) (interpreting California law).

> Under California law, a substantial quantum of inconsistency or ambiguity in a contract for the sale of goods is not a prerequisite to consideration of the parties' subsequent conduct. Under section 2202 of California's Commercial Code, terms of a contract involving the sale of goods may be explained or supplemented . . . by course of performance. More specifically, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement, Cal.Com.Code § 2208(1), subject to the proviso that "express terms shall control course of performance."

---

"Corporation File Detail Report" for TWG Warranty is granted. This information is accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

*Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 857 (9th Cir. 1995).

There is a genuine dispute about Aon's contractual rights to use Actuate's software. Specifically, Aon argues that the parties' ten-year course of conduct, before the 2005 Clickwrap, established Aon's license to use a certain number of CPUs without regard to the number of cores within a CPU. If true, then any attempt by Actuate to materially change this contractual relationship with the 2005 Clickwrap agreement required a definite expression of assent to modify. Actuate, on the hand, argues that there was no prior contractual relationship defining CPU use, and therefore the 2005 Clickwrap agreement did not modify an existing contractual relationship. Relatedly, the parties dispute whether the parties' pre-2006 contractual relationship entitled Aon to receive version 8 and therefore foreclosed any consideration for entering into the 2005 Clickwrap agreement. As discussed below, both sides offer documents and testimony in support of their positions. To sum up, there is a genuine dispute about the terms of the parties' pre-2006 contractual relationship.

One key dispute is whether the terms of the 2003 EUSLA agreement, with a provision on CPU use, applied to the software at issue. If so, a reasonable jury could find that Aon's use of 10 CPUs with twenty cores was within the licensing provision of the 2003 EUSLA, which allowed for use by counting CPUs and did not differentiate by number of cores (Wong Decl. Exh. 10 at Section 1.05). On the other hand, if instead the terms of the 2003 EUSLA agreement did not cover the software at issue, then a reasonable jury could find could find that the 2005 Clickwrap agreement applied and Aon's use of twenty cores was outside the scope of that license (Tadlock Decl. Exh. 11 at 7). This precludes summary judgment for either party.

Aon argues that a 2003 EUSLA agreement, including its provision on CPU use, was intended by Aon and Actuate to be a master agreement for all of Actuate software. There was no express language in the 2003 EUSLA that purported to do so (*see* Tadlock Decl. Exh. 34). Nevertheless, Aon has submitted sufficient evidence for a reasonable jury to find that Aon and Actuate both intended the 2003 EUSLA agreement to cover all licenses for Actuate software, including the iServer, eReport and Query software at issue in this action. For example, Aon cites

5

a December 2004 email from Steve Strain, major account manager for Actuate, suggesting that the terms of the 2003 EUSLA applied to all software licenses:

> Actuate was able to recognize the maintenance cap [of 5%] because of the contract that we have in place with AON and the business units. We have linked all AON family companies to this particular contract and we should not experience this issue moving forward. Prior to this issue coming up the link was not made in our system and therefore we had to go through this exercise. Although I have been assured, hang on to the contract and my email so that least we have a quick reference point

(Wong Aon Decl. Exh. 12). There are other examples:

> September 1, 2005 — Carol Rudolph stated, "Aon has a master license agreement which provides for a maximum of 5% increase in maintenance fees per year. The contact reference number is ACT0002298;"
>
> September 8, 2005 — Daniel Earls, Actuate's in-house legal counsel, stated, "Section 5.01 of the license agreement caps maintenance increases to no more than 5% yr/yr;"
>
> October 1, 2007 — Marina Paw stated, "Also attached are the agreements under AON." Ms. Paw then attached the 2003 EUSLA to her email.

(Wong Aon Decl. Exh. 6). The resolution of whether the contractual terms for the iServer, eReport and Query software were similar, or the same, as the 2003 EUSLA agreement is material for determining the enforceability of the 2005 Clickwrap agreement, and therefore, adjudicating plaintiff's asserted claims.

Actuate retorts that the 2003 EUSLA cannot, as a matter of law, cover the software at issue because Section 10.15 of the EUSLA requires that any changes to the agreement be made in writing and signed by authorized representatives of both parties, regardless of the course of performance (Tadlock Decl. Exh. 34 at Section 10.15). This argument misses the point. There is sufficient evidence from the parties' course of dealing — such as Actuate's billing practices and Aon's maintenance fee payments — to find that the contractual terms for the iServer, eReport and Query software were similar, if not the exact same, as the 2003 EUSLA agreement. For the

6

purposes of this motion, there is still a genuine dispute of material fact even if the 2003 EUSLA was not amended to expressly encompass the iServer, eReport and Query software.

As a fallback, Aon argues that summary judgment is proper because there is no evidence that the Aon employees who clicked on the 2005 Clickwrap agreement were authorized to enter into such an agreement on behalf of Aon. This argument is rejected. Aon requested version 8 from Actuate and actively instructed its employees to install the software by creating an installation guide which instructed each person to accept the license agreement terms and click 'Next' (Tadlock Decl. Exh. 18). This is sufficient, for purposes of this motion, to establish that Aon's employees had authority to enter into an agreement on behalf of Aon.

Therefore, the motions for summary judgment by Aon and Actuate are both **DENIED**.

**2. TWG WARRANTY GROUP IS NOT LIABLE AS A MATTER OF LAW.**

Copyright licenses must be construed in accordance with the purposes underlying federal copyright law. State law can be relied on to provide the canons of contractual construction, but only to the extent such rules do not interfere with federal copyright law or policy. *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989). Copyright license are not transferable as a matter of law. *Gardner v. Nike, Inc.*, 279 F.3d 774, 780 (9th Cir. 2002).

> [Under California law], the validity of an assignment that results merely from a change in the legal form of ownership of a business depends upon whether the assignment affects the interests protected by the nonassignability provision.
> *Trubowitch v. Riverbank Canning Co.*, 182 P.2d 182, 30 Cal.2d 335, 344–45 (1947).

*Openwave Systems Inc. v. Myriad France S.A.S.*, 2011 WL 1832999 at *5 (N.D. Cal. 2011) (Alsup, J.); *but see SQL Solutions, Inc. v. Oracle Corp.*, 1991 WL 626458 (N.D. Cal. Dec. 18, 1991) (Patel, J.) (offering a different interpretation of same California Supreme Court opinion). Other courts in different jurisdictions have similarly held that a purchase of shares in a corporation does not, as a matter of law, effect a transfer of the corporate assets, including licenses to intellectual property, to the shareholder. *See, e.g.*, *Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489, 494 (1st Cir. 1997); *Meso Scale Diagnostics, LLC v. Roche*

7

*Diagnostics GMBH*, 2011 WL 1348438 at *11–13 (Del. Ch. April 8, 2011).  So too in Illinois. *See Essex Intern., Inc. v. Clamage*, 440 F.2d 547, 549–51 (7th Cir. 1971) (applying Illinois law).[2]

Contrary to what Actuate suggests, the law does not presume that a forbidden (and therefore void) transfer of rights occurred when AWG changed its name and became a subsidiary of Onex.  The undisputed evidence shows that this transfer of ownership occurred through a stock acquisition.  There is no evidence that assets were transferred or that AWG's corporate veil was pierced.  Actuate does not provide any analysis regarding whether the stock acquisition of AWG affected the interests protected by the non-assignable copyright license.  As such, there is no evidence to suggest that AWG's stock acquisition voided the license to Actuate's software.

Actuate cites non-binding opinions, interpreting law from different states, for its contention that AWG's stock acquisition and name change voided the software licenses as a matter of law.  These cited opinions are easily distinguished because those facts involved mergers and asset transfers.  There was no merger or asset transfer in our case, only a change in stock ownership.  As the Court of Appeals for the First Circuit aptly described,

> Stock sales are not mergers whereby outright title and ownership of the licensee-corporation's assets (including its patent licenses) pass to the acquiring corporation.  Rather, as a corporation, [appellee] "is a legal entity distinct from its shareholders." Absent compelling grounds for disregarding its corporate form, therefore, [appellee's] separate legal identity, and its ownership of the patent cross-licenses, survive without interruption notwithstanding repeated and even drastic changes in its ownership.

*Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489, 494 (1st Cir. 1997) (citations omitted).

Because the license to Actuate's software was not void, TWG Warranty was authorized to use of Actuate's software in the manner that it did.  Actuate does not argue that TWG Warranty's use exceeded the limits of the license purchased by AWG (other than to argue, as discussed above, that the license was void in its entirety).  Therefore, as a matter of law, TWG

---

[2] Because California law and Illinois law do not materially differ on this issue, there is no need to decide which state law applies.

8

Warranty was entitled to use the Actuate software and is entitled to summary judgment of non-infringement. Actuate's Section 17200 claim of unfair competition against TWG Warranty is based on the alleged copyright infringement, and is therefore also dismissed.

**CONCLUSION**

For the reasons discussed, TWG Warranty's motion for summary judgment is tentatively **GRANTED**. Actuate's and Aon's motions for summary judgment are tentatively **DENIED**.

**IT IS SO ORDERED.**

Dated: May 30, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

9